**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-435-RBW** |
| **MICHAEL BRADLEY,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Bradley ("Bradley") to 100 months' incarceration (near the bottom of the 97-to-121-month guideline range), three years' supervised release, $2,000 in restitution, and a mandatory special assessment of $550.

**I.    INTRODUCTION**

Bradley participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Bradley, a 50-year-old elevator mechanic from Forsyth, Georgia, drove to Washington, D.C. from Forsyth on January 5, 2021 to attend then-President Trump's rally scheduled for the next day. On January 6, he attended the rally and then walked to the Capitol Building, entering the restricted area near the Peace Circle shortly before 2:52 p.m. Once on the Capitol Grounds, Bradley climbed to the Lower West Terrace (LWT) and watched as other rioters smashed exterior windows on the Capitol Building and entered the Building by climbing through those windows, while other rioters attempted to push their way into the Building through the Tunnel located at the center of the LWT.

After a line of uniformed police officers cleared most rioters out of the Tunnel at around 4:26 p.m., numerous rioters began assaulting the police line at the entrance of the Tunnel, using their hands, feet, metal poles, bear spray, hockey sticks and other improvised weapons. Observing these assaults on police officers from his vantage point on the LWT, Bradley approached the police line and made two unsuccessful attempts to swing a metal baton at officers. Each time, he was sprayed by police officers and retreated.

After his two unsuccessful attempts, Bradley moved towards the walls around the Tunnel to shield himself from the spray and get close to the police line at the Tunnel entrance. Once he reached the edge of the Tunnel entrance, he repeatedly swung his metal baton at officers inside the Tunnel. After multiple swings, Bradley ducked back behind the edge of the wall at the Tunnel entrance, shielding himself from any police response to his actions. Bradley then holstered his

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

baton, took a few minutes to regain his breath, then moved away from the Tunnel entrance and back into the crowd on the LWT.

For his actions, the government recommends that the Court sentence Bradley to 100 months of incarceration. A 100-month sentence not only reflects the gravity of Bradley's conduct, but also takes into consideration his repeated and blatant lies to this Court when he testified about these events under oath at trial.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Complaint and Stipulations filed in this case for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. *See* ECF 1, 58.

### B.    Bradley's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Bradley attended the Trump Rally and then walked to the U.S. Capitol Building. He was first captured in video footage on U.S Capitol Grounds while walking towards the Capitol Building from the direction of the Peace Circle shortly before 2:52 p.m., wearing a quilted camouflage jacket, camouflage hat and blue jeans.



*Image 1 – Bradley approaching the West Front from the Peace Circle,
with his phone in hand (Gov. Trial Exh. 422 at 00:04)[2]*

By shortly before 4:26 p.m., approximately an hour and a half later, Bradley had made his

way to the LWT:



*Image 2 – Bradley listening to speakers at LWT (Gov. Trial Exh. 425A at 5:42)*

From that vantage point, Bradley could see groups of rioters breaking out windows on the

Capitol Building and entering the Building through those windows, and also shoving their way

---

[2] Bradley is circled in yellow in the images in this Sentencing Memorandum.

4

into the LWT Tunnel in an attempt to gain access into the Capitol Building. Bradley was also standing in this spot on the LWT when two men announced over a megaphone to the gathered crowd (including Bradley) that the crowd had been labelled "anarchists," and that the police were considering "using lethal force against us."

At around 4:27 p.m., while the police line inside the Tunnel was near its entrance, Bradley watched as rioters attacked officers using sticks, crutches, flagpoles, and bats, and ultimately pulled two officers into the crowd. Soon thereafter, Bradley entered the fray. He worked his way towards the police line, extending his baton, and straddled a stair railing to get a better angle at the police. He then lifted his baton to swing it at the police:



*Image 3 – Side-by-side images of Bradley straddling the railing, preparing to swing his baton at the police (Gov. Trial Exh. 501 at 00:14)*

As Bradley lifted his arm to swing at the officers, an officer sprayed a riot control spray at Bradley. This caused Bradley to momentarily retreat and turn his head away from his intended targets.



*Image 4 – Bradley turning away as an officer (red arrow) sprays at the mob*
*(Gov. Trial Exh. 405A at 00:33)*

Undeterred, Bradley made a second attempt to attack the police a few seconds later. He again moved forward, next to another rioter who was at that moment pulling a prone officer into the mob and cocked his arm to swing at the police.



*Image 5 – Bradley cocking up his arm with the baton in hand, as a fellow rioter (red arrow)*
*pulls a prone officer (orange arrow) into the mob (Gov. Trial Exh.402A at 00:23)*

As he raised his arm, Bradley was sprayed again and turned away for the second time.



*Image 6 – Bradley turning away to avoid the spray a second time*
*(Gov. Trial Exh.405A at 00:44)*

Still undeterred, Bradley made a third, ultimately successful attempt to attack the police. This time, while other rioters in front of him continued to pull an officer into the crowd, Bradley moved to his left, and worked his way to the entrance of the Tunnel, using the wall to the left of the entrance to block riot spray from the police line.



*Image. 7 - Bradley pushing his way up and towards the side of the Tunnel*
*(Gov. Trial Exh. 406A at 00:55)*

While working his way towards the Tunnel entrance, Bradley paused briefly, turned, and waved other rioters forward towards the beleaguered police line.



*Image 8 – Bradley waving other rioters towards the police line at the Tunnel*
*(Gov. Trial Exh. 406A at 01:09)*

Once Bradley climbed to the Tunnel entrance, he reached around another rioter and swung his metal baton two times at the police officers standing on the left side of the police line at the entrance of the Tunnel. While video footage presented at trial did not conclusively establish whether Bradley's swings into the Tunnel made contact with any of the officers in the police line, it was clear Bradley used his height and weight (standing six feet, two inches tall and weighing 220 pounds) to swing his baton down forcefully onto the heads of the police officers on the police line.



*Image 9 – Side-by-side images of Bradley swinging his baton at the officers in the Tunnel, as viewed from cameras inside and outside of the Tunnel (Gov. Trial Exh. 501 at 01:36)*

After swinging the baton at the police, Bradley retreated to his left, again using the wall by the Tunnel entrance to protect himself from any police response to his assaults. He leaned up against the wall to catch his breath and holstered his baton, while his fellow rioters continued to assault officers at the Tunnel entrance. As he stood against the wall, rioters also destroyed windows and climbed into the U.S. Capitol Building mere feet away from Bradley. He did nothing to deter any of them.



*Image 10 –Bradley resting following his assault, in close proximity to another rioter destroying a window with the handle-end of a baseball bat (Gov. Trial Exh. 421 at 00:14)*

After a few more minutes, Bradley began to leave the LWT. He did not have to shove his way out; he walked calmly through the crowd as further assaults on the police line occurred.



*Image 11: Bradley walking away from the Capitol Building*
*(Gov. Trial Exh. 423 at 00:33)*

Bradley left the Capitol Grounds at sunset, about two hours after he arrived.



*Image 12 – Bradley leaving the U.S. Capitol Grounds as night falls*
*(Gov. Trial Exh. 420A at 00:25)*

### C. Bradley's False Statements to the FBI

On September 7, 2023, Bradley was interviewed by FBI agents in the immediate aftermath of his arrest for his conduct on January 6, 2021. During the interview, he told the agents that he was forced to move up to the LWT Tunnel by the movement of the crowd of rioters. He told agents that he kept trying to go back down the stairs away from the Tunnel, but he couldn't. He also told the agents that when he tried to move away from the Tunnel, he almost got crushed, and thought he was going to die. He also told the agents, "I never saw an officer. Period," and that his assault on the police at the entrance of the Tunnel was the result of his arguing with other protesters and trying to stop them from destroying the U.S. Capitol Building.

Those statements were lies. Bradley was not "funneled up" to the entrance of the Tunnel, and his violent conduct at the Tunnel entrance was in no way related to any alleged desire to curb the conduct of his fellow rioters. As numerous video exhibits presented at trial showed, Bradley used his large size and strength to push his way to the front of the Tunnel. *See, e.g.,* Gov. Trial

Exh. 406A. Once there, he actively joined the ongoing assaults by rioters against the police. He was not shoved up to the front of the Tunnel; he did not seek to calm other rioters; and he did not try to stop property damage. Bradley's assertions that he never saw an officer are repudiated by the body worn camera recordings of the officers in the police line. Those videos showed Bradley staring at the officers, focusing on them as he sought to close the distance to the police line, over and over again.



*Image 13 – Bradley staring at officers as he approaches the police line at 4:27:29 P.M. (Gov. Trial Exh. 302A at 02:37)*



*Image 14 – Bradley staring at officers as he approaches the police line at 4:27:33 P.M.*
*(Gov. Trial Exh. 304A at 03:25)*



*Image 15 – Bradley staring at officers as he approaches the police line at 4:27:41 P.M., while*
*other rioters pull an officer down the stairs*
*(Gov. Trial Exh. 303A at 03:04)*



*Image 16 – Bradley staring at officers immediately after swinging into the tunnel at 4:28:34 P.M. (Gov. Trial Exh. 306A at 03:53)*

### D.  Bradley's False Trial Testimony

Bradley testified in his own defense at trial. He testified that he drove to Washington, D.C. to support Donald Trump. After the speech, he walked with others to the Capitol Grounds. Once on Capitol Grounds, he claimed he was forced up onto the LWT by a flood of other rioters, and feared for his life as he was carried by the crowd onto the LWT. He also claimed that as he tried to stop other rioters from destroying property, another rioter attempted to assault him with a metal baton. Bradley testified he disarmed this other rioter and retained the metal baton, which he carried until he threw it into a trash can while leaving Capitol Grounds on the evening of January 6. He claimed he was angry with the rioters for destroying the Capitol and was working with others in the crowd to get the rioters to stop. He repeatedly asserted that he had no idea that there were police officers inside the Tunnel, and he thought he was swinging at other rioters and not police officers.

Bradley testified that the holster at his waist was not for the baton. Instead, the holster held his flashlight and the flashlight was in the holster the entire time that he was on Capitol Grounds

on January 6th. Bradley even brought his flashlight in its holster, along with photographs of the

flashlight and holster, to trial. The Court admitted the photographs into evidence.



*Images 17 and 18 –Flashlight Bradley brought to Court (Def. Trial Exh. 20A, 20B)*



*Image 19–Flashlight out of its holster (Def. Trial Exh. 20C)*

On rebuttal, the assigned FBI case agent testified that the flashlight and its holster did not

match the holster that Bradley wore on January 6th. The agent noted that the flashlight and its

holster were not the right size and the location of the loop to attach the flashlight to the belt was

not at the right location. The agent further highlighted an image from one of the videos, which

16

demonstrated that the holster was empty when Bradley was brandishing the baton. The image

also shows that the loop on the holster was at the top of the holster, unlike the loop on the flashlight

holster in the images above, which was located closer to the middle of the holster's rear.



*Image 20 – Bradley brandishing his baton with an empty holster on his right hip (blue arrow)*
*(Gov. Trial Exh. 302A)*

The Court found Bradley's testimony not credible and explained its reasoning at length.

- *See, e.g.,* 08/28/24 Tr.at 526 ("[C]ontrary to the defendant's representations that he never saw police officers that day, I think it's just totally inconceivable that someone looking into that tunnel -- and the evidence clearly showed on multiple occasions he was looking in the direction of the tunnel -- that he would not have seen this row of police officers who were inside of the tunnel.").

- *Id.* at 527-528 (Bradley "testified that he was hit from behind, and he was attacked by people from behind, and that's why, for example, he did not strike a blow on the first two occasions when he clearly raised the baton as if he was prepared to strike a blow, and he claims he didn't strike the blow because he was attacked from behind. The evidence, in my

17

view, just doesn't support that, that position.").

- *Id.* at 528-529 (Bradley "also claims that he did not bring that baton with him, but the evidence, in my view, just doesn't support that because the government was able to show through the testimony of the agent that the holster that he had on his right side -- which he admits there was something on his right side -- he claims it was a holster that held a flashlight, whereas the government's position is it was a holster that held a collapsible baton. And I think the government prevails on that, and they proved beyond a reasonable doubt that the item that he claims that he had was not, in fact, the item that he actually had on his hip based upon what the film depicted because it had the holes in it, which was not consistent with the item that he said he had…. But what I think totally shows that Mr. Bradley was not being truthful …was this was daylight, and if -- and he says he carries this -- he carries this item all the time. Then why during the daylight would you reach into a holster and pull out a flashlight? That just doesn't make any logical sense,")

- *Id.* at 530 ("Also, as I indicated, [Bradley] had the opportunity on two occasions to strike blows against the other rioters. He claims he was trying to protect the police from the rioters, and the evidence in my view just doesn't show that that was, in fact, the case…. And contrary to what he [Bradley] attempted to try and show, in my view, there is just no evidence that would indicate that between him and the police officers were civilians who were other rioters who he would have been trying to hit, as compared to him trying to hit the police officers.").

The government concurs with the Court's assessment that Bradley's claims of wanting to help police officers are plainly false. The evidence proved that Bradley completely ignored the opportunity to help an officer being actively dragged into the crowd of rioters. Instead, Bradley sought to move around the rioter dragging an officer by his feet, in order to get closer to his real target: the police line at the entrance of the Tunnel.



*Image 21- Bradley, with his hand on the back of the rioter pulling an officer's foot (red circle), was focused on hitting the officers in the Tunnel, not helping the one on the ground (Gov. Trial Exh. 405A at 00:42)*

## III.    THE CHARGES AND TRIAL

On December 13, 2023, a federal grand jury returned an indictment charging Bradley with

seven counts:

- Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1);

- Assaulting, Resisting, or Impeding Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count 2);

- Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 3);

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 4);

- Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous

Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count 5);

- Disorderly Conduct on Capitol Grounds, in violation of 40 USC § 5104(e)(2)(D) (Count 6); and

- Act of Physical Violence on Capitol Grounds, in violation of 40 USC § 5104(e)(2)(F) (Count 7).

*See* ECF 14.

On August 28, 2024, this Court convicted Bradley of each those offenses following a bench trial. *See* ECF 69, 70.

## IV.    STATUTORY PENALTIES

Bradley now faces sentencing on all seven counts. The presentence report identified the statutory maximum penalties for each count. PSR ¶¶ 124-30, 132-34, 140-43, and 151-54.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government's Guidelines calculations are as follows:

Count One: 18 U.S.C. § 231(a)(3)

U.S.S.G. § 2A2.2(a)[3]          Base Offense Level          14

---

[3] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used. U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." The cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt., n.1.

Here, Bradley used a dangerous weapon, the baton, to assault police on the West Front of the Capitol. As this Court's verdicts established, that conducted violated 18 U.S.C. 111(b), a felony

| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Count Two: 18 U.S.C. § 111(b)

| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **28** |

Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)[5]

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14[6] |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |

---

for which the maximum term of incarceration is 20 years. The evidence also proved Bradley's intent to commit another felony, civil disorder in violation of 18 U.S.C. § 231(a)(3). *See United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where defendant acted "with intent to commit civil disorder under Section 231(a)(3).")). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

[4] As discussed above, the cross-reference from U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault and the assault on the officers here qualifies as aggravated assault..

[5] U.S.S.G. §§ 2A2.4 and 2B2.3 are the Chapter Two guidelines that apply to violations of 18 U.S.C. § 1752. U.S.S.G. App. A, Statutory Index. Section 2B2.3, the Guideline for trespass offenses, is the most analogous Guideline for § 1752(a)(1), which is a trespass offense. Section 2B2.3(c) states that "if the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above."

[6] Under § 2X1.1(a), the base offense level is "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Here, Bradley's trespass on the Capitol grounds was "committed with the intent to commit" the felony offense of aggravated assault. Section 2A2.2, and all the adjustments that apply to Count 2, therefore apply.

| U.S.S.G. § 3A1.2(c) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Count Four: 18 U.S.C. § 1752(a)(2) and (b)(1)(A) [7]

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(c) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Count Five: 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **26** |

Because Count 6 and 7 are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. Under U.S.S.G. §3D1.2, "closely related counts" group, so Bradley's counts of conviction form one group with a Total Offense Level of **28**.

The U.S. Probation Officer calculated Bradley's criminal history as category III. PSR ¶ 67. Bradley disputes this calculation. Based on Bradley's total adjusted offense level and a criminal history category III, his Guidelines imprisonment range is 97 to 121 months' imprisonment.

---

[7] Section 2A2.4, the Guideline for obstructing officers, is the most analogous Guideline for § 1752(a)(2), which is an obstruction offense. As discussed above regarding Count One, the cross-section from § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) applies to Bradley's violation of § 1752(a)(2).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bradley's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bradley entered the Grounds at the Peace Circle, climbed up to the LWT, watched the violence and destruction, and then joined the fray by approaching the Tunnel and winging his baton at the police. The nature and circumstances of Bradley's offenses were of the utmost seriousness, and fully support the government's recommended 100 months' incarceration, three years' supervised release, $2,000 in restitution, and a mandatory special assessment of $550].

### B.  Bradley's History and Characteristics

Bradley is a 50-year-old elevator mechanic with a criminal history dating back 30 years. That history includes violent crimes and drug trafficking. PSR ¶¶ 51-66. Unlike many January 6 defendants who are "zero-point offenders," Bradly has six criminal history points and is in CHC III. PSR ¶ 67. Bradley's protracted criminal history also weighs heavily in favor of a lengthy period of incarceration:

- In 1992, Bradley was convicted of obstructing an officer, driving under the influence (DUI) and affray.[8] PSR ¶¶ 51-53.

---

[8] Affray is defined as fighting in a public place.

- In 1995, Bradley was convicted of DUI, fleeing a police officer and reckless driving, resulting in a sentence that included six months' confinement. PSR ¶ 54.

- In 1996, Bradley was convicted of forgery, giving a false name to a police officer (two times), DUI and contempt of court, resulting in a sentence that included two years' confinement. ¶¶ 55-57.

- In 1998 and 1999, Bradley suffered marijuana possession convictions, resulting in sentences that included a period of probation, which was subsequently revoked. Bradley was subsequently resentenced to one year, eight months, and seven days of confinement. PSR ¶¶ 58-59.

- In 2000, Bradley pled guilty to obstructing an officer, resulting in a sentence that included 12 months' confinement, concurrent to a felony violation of an earlier term of probation. PSR ¶ 60.

- In 2001, Bradley was found guilty of Battery-Family violence for "causing visible bodily harm" to the victim, resulting in a sentence that included eight months of confinement. PSR ¶ 61.

- In 2002, Bradley was convicted of methamphetamine trafficking and sentenced to 12 years in custody. PSR ¶ 62.

- In 2008, 2009 and 2010, Bradley was convicted of multiple traffic violations, the last of which resulted in a sentence including two concurrent periods of 60 days' confinement. PSR ¶¶ 63-65.

- From 1991 through 2010, Bradley also suffered a series of arrests that did not result in criminal charges. PSR ¶¶ 69-78.

Bradley's crimes on January 6 were not an isolated event in an otherwise law-abiding life. Although Bradley's last conviction was 14 years ago, in 2010, it came after a long series of criminal offenses. Notwithstanding his protracted criminal history, Bradley secured a stable, well-paying job on which his family relied. But on January 6, he threw all of that away to assault police officers and attack the U.S. Capitol.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bradley's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Bradley has yet to concede that he did anything wrong or show any remorse towards the officers that he assaulted with his metal baton on January 6th. Instead, he has maintained that he was the good guy – he saw no officers; he was trying to stop rioters from destroying the Capitol; and he only carried a flashlight -and not a baton- to the Capitol on that day. None of these assertions are true. A significant prison sentence is warranted to deter Bradley, a decades-long recidivist criminal, from future crimes.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

26

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). [10] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[11] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Sean McHugh*, 21-cr-453 (JDB), the defendant was a construction worker and electrician who owned his own business and financially supported his family before he was arrested for his actions on January 6, 2021. He urged people to fight and storm Congress and came to the Capitol armed with a cannister of bear spray. McHugh was at the initial breach at the Peace Circle, wrestled with an officer for control of a barricade, assaulted officers with his bear spray, spewed vitriol at the officers over a megaphone, and shoved a large, metal-framed Trump sign at a police line.

On April 17, 2023, Judge Bates presided over a stipulated trial and found McHugh guilty of §§ 111(b) and 1512. McHugh was in criminal history category IV. His Guideline range was 110 to 137 months. McHugh argued in his sentencing memorandum that he was swept up in the mob mentality, had been awake over 48 hours, became upset when he saw his mother get hit by a rubber bullet, and was incarcerated through the COVID pandemic.

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Judge Bates varied downwards and sentenced McHugh to 78 months' incarceration, a sentence in line with "cases involving defendants with similar records who have been found guilty of similar conduct." Tr. at 50. Here, Bradley has many similar aggravators (a §111(b) conviction, significant criminal history, brought a weapon to the U.S. Capitol and used it against the police). Unlike Bradley, McHugh ultimately took responsibility for his crimes, and did not perjure himself.

In *United States v. Craig Bingert,* 21-cr-91 (RCL), Judge Lamberth convicted the defendant after a bench trial of, *inter alia*, violating 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1512(c)(2), and 18 U.S.C. § 231(a)(3). Bingert, along with others, charged up the stairs on the West Front of the Capitol as the officers retreated. Once Bingert reached the top, he chanted "let us in!" with other rioters. After spending several minutes near the police line and filming another rioter spray the officers with a fire extinguisher, Bingert joined with others to forcibly push bike racks into the line of police officers for at least 15 seconds. One of the officers was struck in the leg causing pain. Bingert remained on the Upper West Terrace for hours watching the violence in the Lower West Terrace tunnel and had to be forced off the terrace by police.

Judge Lamberth sentenced Bingert to 96 months of incarceration. Although Bingert's actions on January 6 were similar to Bradley's (he was at the West Front for hours; he watched the violence unfold and chose to join; and he waved others on), Bingert was in criminal history category I, and he did not bring a weapon to the U.S. Capitol and swing it at the police.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Bradley was convicted of multiple violations of offenses under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar

covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay. [12]

Because Bradley engaged in criminal conduct in tandem with  hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

"government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Bradley to pay $2,000 in restitution for his convictions on Counts One through Seven. This amount fairly reflects Bradley's role and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Bradley's convictions for violations of 18 U.S.C. § 231(a)(3) (Count 1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count 2); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 3); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 4); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count 5); Disorderly Conduct on Capitol Grounds, in violation of 40 USC § 5104(e)(2)(D) (Count 6); and an Act of Physical Violence on

Capitol Grounds, in violation of 40 USC § 5104(e)(2)(F) (Count 7) subject him to a statutory maximum fine of $250,000 for Count 1, $250,000 for Count 2, $250,000 for Count 3, $250,000 for Count 4, $250,000 for Count 5, $5,000 for Count 6, and $5,000 for Count 7. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Bradley's financial assets set forth in the PSR suggest that his asserts should be used to support his family and not pay a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 100 months' incarceration, three years' supervised release, $2,000 in restitution, and a mandatory special assessment of $550.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney

By:    */s/ Alexandra F. Foster/Samuel White*
Alexandra Foster, DC Bar No. 470096
Samuel White, NC Bar No. 44908
Assistant United States Attorneys
United States Attorney's Office
601 D Street, NW
Washington, DC 20530
Phone: (619) 546-6735
Alexandra. Foster@usdoj.gov