UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES of AMERICA ) | |
| ) | |
| vs. ) | No. 23-cr-435-RBW |
| ) | |
| MICHEAL BRADLEY, ) | |
| ) | |
| Defendant. ) | |

DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Micheal Bradley, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Following a bench trial, the Court entered verdicts of guilty against Mr. Bradley on all counts. For the reasons stated below, Mr. Bradley respectfully suggests that a sentence of 60 months is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing, and should be imposed.

FACTS

A. Micheal Bradley's History and Characteristics

Micheal Bradley was born January 8, 1974, to Charles Bradley (then 24 years old) and Nancy (Gann) Bradley (then 16 years old). His childhood was "rough" – both his parents abused alcohol, and they fought until they were divorced when Micheal was 3 years old. Following their divorce, Micheal lived with his mother, who remarried. Micheal left the home at age 14, and has lived independently since then.

After he left home, Micheal got involved in alcohol and drugs, and lived "on the streets" periodically. From the age of 18 until his early thirties, he was arrested numerous times, for offenses including obstruction of an officer, driving under the influence of alcohol, affray

("fighting by two or more persons in some public place to the disturbance of the public tranquility"), O.C.G.A. § 16-11-32, forgery, possession of marijuana, and domestic battery. In 2002, at the age of 28, Micheal was convicted of trafficking in methamphetamine, and sentenced to 12 years' imprisonment. He was imprisoned on that charge until he was paroled in September 2007.

While in prison, Micheal left his troubled past behind. He became a born again Christian, and stopped drinking alcohol and taking drugs. After his release from prison in 2007, Micheal held a series of jobs, including plumber, automotive technician, and trailer mechanic. In 2016, he joined the International Union of Elevator Constructors Local 32 as an apprentice elevator mechanic. Since then, Micheal has been an "exemplary member" of Local 32, *see* Letter of Matt Stell, Exh. A hereto, completing five years of training and rising to the position of Foreman. Micheal's supervisor describes him as "one of my best mechanics who I rely on to get the job done." *See* Letter of Joshua Vandegriff, Exh. B hereto. According to Mr. Vandegriff, "Micheal is a good, honest, Family man" whose "integrity is above reproach." *Id.*

After his release from prison, Micheal also met and married Kendall Walker, forming a new family including Micheal's 7-year old son by a previous relationship, and Kendall's daughters Dakota (then 9) and Skylar (then 4), and her son Landyn (then 3 months old). Micheal and Kendall raised their children together. Micheal's pastor calls him "a hard working man [who] provides for his family," and "a devoted father and grandfather." *See* Letter of Terrell Hopkins, Exh. C hereto. Today, Skylar is a student at Auburn University.

Micheal adopted Landyn, and as Kendall puts it, Micheal is "the only father Landyn has ever known." *See* Letter of Kendall Bradley, Exh. D hereto. The two have "a very special relationship," evidenced by Landyn's request, at age 13, to change his name to Landyn Micheal Bradley. *Id.* When Landyn decided, at age 6, that he wanted to become a bull rider,

2

Micheal threw himself – and the entire family – into supporting that dream, to the point of establishing a bull breeding business that he and Landyn ran together. *Id.*

In 2022, the family was devastated to learn that Dakota had been brutally beaten and killed by her partner, Carlos Leyva Cabrera, with whom she had two small children, Amelia (then 11 weeks old) and Lukas (then 2 years old).[1] Micheal and Kendall adopted Lukas and Amelia, and became full-time parents not only to their grown children, but also to a newborn and a toddler. Dakota's death, and the brutal circumstances of her killing, have profoundly affected Micheal, not only emotionally, but practically. He now has two small children at home to raise and support. Had that been the case in January 2021, he never would have come to Washington.

Kendall works full time managing a medical office, but the family relies heavily on Micheal's salary, which supplies more than half the family's income. The family also relies heavily on Micheal to run their bull breeding business. With Micheal incarcerated, Landyn – a high school student – tends the animals that previously he and Micheal cared for together. Meanwhile, Kendall struggles to keep the business afloat. To do so, she has had to sell several animals (heifers, bulls, and a horse), and some farm equipment.

## B. The Nature and Circumstances of the Offense

Micheal Bradley was convicted, *inter alia*, of attempting to assault federal law enforcement officers, in violation of 18 U.S.C. §111, based on video evidence that showed him swinging a baton into the entrance of the Lower West Terrace Tunnel on January 6, 2021. In order to convict Mr. Bradley under §111, the government was required to prove – beyond a reasonable doubt – that when Mr. Bradley swung that baton, there was a federal law

---

[1] Mr. Leyva Cabrera has recently entered into a plea agreement that will see him released from prison next year, after serving three years.

enforcement officer at its other end. Section 111 does not punish mere assault – the gravamen of the crime is the assault of a *law enforcement officer*, and the applicability of the statute turns on the identity of the alleged victim. A defendant may be convicted under the statute even if that defendant was unaware that the victim was, in fact, a federal law enforcement officer. *United States v. Feola*, 420 U.S. 671, 686 (1975), *Lucas v. United States*, 443 F. Supp. 539, 544 (D.D.C. 1977). Conversely, a defendant who assaults an individual who is *not* a federal law enforcement officer may not be convicted under §111 even if that defendant believed the victim *was* such an officer.

There were numerous reports that civilians stole Capitol Police officers' clothing and equipment on January 6, 2021. *See, e.g.,* Paul P. Murphy, *Feds charge man who claimed he dressed up like Antifa and beat, stole gear from police during Capitol riot,* CNN (Mar. 2, 2021), available at https://www.cnn.com/2021/03/02/politics/capitol-riot-antifa-defendant-trnd/index.html (defendant accused of stealing police helmet and vest). A defendant who assaulted one of these civilians – wrongly believing that they were a Capitol Police officer because they wore stolen police equipment – could not be convicted under §111 because the statute requires that the victim be an "officer or employee of the United States … engaged in … the performance of official duties." 18 U.S.C. §§111(a), 1114(a).

Thus, in order to convict Micheal Bradley of violating §111, the government here was required to prove that when he swung the baton into the mouth of the West Tunnel, the person at whom he swung it was, in fact, a federal officer. But there was no evidence showing who was at the end of that baton when Mr. Bradley swung it. Moreover, the video evidence clearly showed that at the time Mr. Bradley swung the baton, there were individuals in the tunnel other than law enforcement officers.

In rendering its verdict, the Court recognized that there was no evidence that Mr. Bradley struck any law enforcement officer. Tr. (Aug. 28, 2024) at 531. However, finding that:

> [C]ontrary to what [Mr. Bradley] attempted to try and show, in my view, there is just no evidence that would indicate that between him and the police officers were civilians who were other rioters who he would have been trying to hit as compared to him trying to hit the police officers.

*Id.* at 530. Therefore, the Court held, "the evidence clearly shows beyond a reasonable doubt that he attempted to strike those police officers who were inside of the tunnel." *Id.* at 531. With all due respect, this was error, since it was not Mr. Bradley's burden to prove, as an affirmative defense, that his putative victim was *not* a police officer. Rather, the *government* bore the burden to prove, beyond a reasonable doubt, that a federal law enforcement officer – rather than one of the civilians whom the evidence clearly showed were inside the tunnel – was at the end of Mr. Bradley's baton. This it failed to do.

## ARGUMENT

The starting point of any federal sentencing proceeding is calculating the applicable Guidelines range, which serves as the "initial benchmark" in determining an appropriate sentence. *United States v. Abukhatallah*, 41 F.4th 608, 643 (D.C. Cir. 2022). However, the Guidelines are not mandatory, and the Court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 644. Ultimately, the Court must impose a sentence "sufficient, but not greater than necessary," to comply with the following purposes:

(A)  to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).  Mr. Bradley respectfully submits that here, that sentence is 60 months' imprisonment.

### A. Application of the United States Sentencing Guidelines

The Probation Office miscalculates Defendant's Criminal History Category, by attributing to Defendant three points pursuant to U.S.S.G. §§4A1.1(a) and 4A1.2(k) for a 1998 conviction for violation of Georgia's Controlled Substances Act ("GCSA").  Presentence Investigation Report ("PSR") (Nov. 25, 2024) [ECF No. 80] ¶58.  Although this 26 year old conviction is far outside the presumptive 15-year "look-back" period under U.S.S.G. §4A1.2(e), the PSR includes it pursuant to §4A1.2(e)(1)'s instruction to "count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period."  For his 1998 GCSA conviction to be counted pursuant to §4A1.2(e)(1) in determining Mr. Bradley's Criminal history, the government must show that Mr. Bradley was incarcerated for this conviction on or after January 6, 2006.  This it cannot do.

The PSR bases its calculation of Mr. Bradley's criminal history primarily on Georgia state court records obtained by the US Probation Office for the Northern District of Georgia.[2] PSR ¶58.  These records indicate, as stated in the PSR, that in 1999, Mr. Bradley pled guilty to possessing marijuana in violation of the Georgia Controlled Substances Act "("GCSA"), and was sentenced to two years' probation. *Id.*  The records further indicate that in January 2001, his probation was revoked, and he was sentenced to 1 year, 8 months, and 7 days

---

[2] After the Court granted Defendant's Motion for Disclosure of these records, the USPO produced them to defense counsel on December 11, 2024.

6

incarceration. *Id.* He was then paroled in November 2001, after serving approximately 9 months' incarceration. *Id.*

The Georgia state court records do not state that Mr. Bradley was ever incarcerated for the 1999 marijuana conviction after November 2001. And since that date is outside the 15-year "look-back" period prescribed by U.S.S.G. §§4A1.2(e)(1), Mr. Bradley's 1999 marijuana conviction may be counted toward his criminal history only if the government can show in some other way that Mr. Bradley was, in fact, incarcerated on the marijuana conviction on or after January 6, 2006.

The PSR asserts that this is the case, stating that "automated NCIC records" indicate that Mr. Bradely was arrested for a parole violation in March 2002, and found guilty in April 2002. PSR ¶58. The Probation Office has refused to share these records with defense counsel, but even if there are such records, the PSR is clearly wrong. It bases its claim that Mr. Bradley was incarcerated for the 1999 marijuana conviction within 15 years of January 6, 2021, on a state court record, which states that Mr. Bradely was paroled from the 1999 marijuana conviction, as well as from a separate 2002 conviction, on September 18, 2007. *Id.* But whatever occurred on September 18, 2007, it is readily apparent that the government cannot show that Mr. Bradley was incarcerated on the 1999 marijuana conviction on that date.

On January 26, 2001, when Mr. Bradely was found to have violated his sentence of probation on the 1999 marijuana offense, he was sentenced to 1 year, 8 months, and 7 days' incarceration. PSR ¶58. He was then paroled on November 7, 2001, after having served slightly more than 9 months of that sentence. Even if Mr. Bradley was found guilty of a parole violation in April 2002, less than one year of the sentence imposed on the 1999 marijuana conviction remained to be served, meaning that Mr. Bradley would have been released well

7

before January 6, 2006. Nowhere does the PSR identify any source indicating that Mr. Bradely was, in fact, incarcerated on the 1999 marijuana conviction on or after January 6, 2006.

With this error are corrected, Defendant is properly located in Criminal History Category II. At a Total Offense Level is 28, the recommended Guidelines Range is 87-108 months.

**B. A Sentence of 60 Months' Imprisonment is "Sufficient, but not Greater than Necessary" to Effect the Purposes of Sentencing.**

As the government has said, in fashioning an appropriate sentence for a January 6 defendant, the defendant's individual conduct must be assessed "on a spectrum." Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C. 12/13/21) [ECF No. 49] at 10. In determining a fair and just sentence on this spectrum, the Court "should look to a number of critical factors," including the defendant's conduct on January 6, 2021, as well as his conduct before and after the events of that day. *Id.*

Having heard the evidence at trial, the Court is well aware of Defendant's actions on that day. However, the "critical factors" the government suggests be considered include whether, when, and how the defendant entered the Capitol building, the length of time the defendant spent inside the building, and exactly where the defendant traveled, *id.*, and it should be noted that Defendant did not enter the building, even though he stood next to a window another individual had broken, and through which others were entering the Capitol. It is also worth noting that there is no evidence that Defendant made any statements, in person or on social media, indicating any intent to engage in violence, or suggesting any pride or pleasure over his actions. Nor is there any evidence that Defendant destroyed evidence. Finally, it should be noted that when Defendant was arrested, he insisted on his right to have counsel present for any interrogation, but only after providing the officers with a statement admitting to his involvement on January 6.

1. A Variance is Called For Here.

    a. Defendant's Family and Health Circumstances Call for a Variance.

A defendant's family circumstances and health problems may be grounds for a variance. *See* Office of the General Counsel, United States Sentencing Commission, *Primer*, *Departures and Variances* (2024), available at https://www.ussc.gov/sites/default/files/pdf/training/primers/2024_Primer_Departure_Variance.pdf, at 37 (citing cases) [hereinafter, *U.S.S.C. Primer*]. Mr. Bradley's family circumstances and health problems cry out for a variance.

Most importantly, the 2022 murder of Mr. Bradley's daughter has devastated his family, not only emotionally, but also financially. Prior to her killing, Mr. Bradley and his wife were about to see their youngest child off to college and become empty nesters. But as a result of the murder, Mr. Bradley and his wife have become parents to a new generation of children, a son and daughter who are still toddlers. These young children, who recently lost their mother, would be profoundly damaged – emotionally, psychologically, and financially – by Mr. Bradley's absence during incarceration.

*Second,* as the Court knows, Mr. Bradley suffers from serious health issues. He is a 50-year old man who has suffered from back pain for many years. Approximately 7 years ago, he was diagnosed with a compressed bulging disk and osteoarthritis. *See* Memorandum in Support of Defendant's Motion to Continue Trial Date, (June 7, 2024) [ECF NO. 54-1] at 2-3 & Exh. B at 2, 3. In April 2024, Defendant was thrown from a horse, aggravating his condition, and subjecting him to constant pain.[3] *Id.* He reports that his left arm and left

---

[3] Defendant also suffered a rupture of the extensor tendon of his left index and middle finger. He had surgery on the hand prior to trial, and has had additional surgery since he has been detained.

9

buttock are numb, and that it is difficult for him to travel, or to sit for extended periods. Prior to his incarceration, Defendant was under the care of an orthopedic surgeon, who determined that he may require spinal fusion surgery. However, his trial prevented him from obtaining further care for this condition, and it remains untreated.

### b. The Guideline Calculation Fails to Reflect the Purposes of Sentencing.

The Court may also grant a variance "in order to provide just punishment for the offense or reflect its seriousness," where the recommended Guidelines range "fails to properly reflect § 3553(a) considerations." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *U.S.S.C. Primer* at 39. That is the case here.

Defendant was convicted of several offenses, but the Guidelines range proposed in the PSR is driven by his conviction under 18 U.S.C. §111(b), for attempting to assault a law enforcement officer. Although there is video evidence that Micheal Bradley swung a baton on January 6, 2021, there is no evidence that he actually struck any law enforcement officer.

Furthermore, as discussed above, there was no evidence at trial showing whether, when Mr. Bradley swung the baton, there was a federal law enforcement officer – rather than one of the many civilians the video evidence showed inside the Tunnel – at its other end. Mr. Bradley has not only been convicted despite this failure of proof; he now faces a Guidelines sentencing range that is premised on this absent proof.

Because he was convicted under §111 – which required proof that the alleged victim was a federal officer – the PSR calculates Mr. Bradely's Base Offense Level using the Guideline provision for *aggravated* assault, U.S.S.G. §2A2.2, which imposes a Base Offense Level (14), double that for simple assault under U.S.S.G. §2A2.3 (7). PSR ¶ 40. The PSR also adds six levels because, it states, Mr. Bradley knew or had reasonable cause to believe that whoever he swung the baton at was a law enforcement officer. PSR ¶43. Thus, Mr. Bradley's

10

Total Offense Level of 28 includes 15 levels premised on the Court's factual finding – unsupported by the evidence – that Mr. Bradley swung the baton at a federal law enforcement officer.

In Mr. Bradley's Criminal History Category (II), the Guidelines range for a Total Offense Level of 28 is 87-108 months. Absent the 15 Offense Levels dependent on proof that the victim was a federal law enforcement officer, his Guideline Range (at Offense Level 13) would be 15-21 months. Moreover, if the Court had not found that Mr. Bradley's alleged victim was a federal law enforcement officer, but nonetheless convicted him on Count 1 (Civil Disorder in violation of 18 U.S.C. §231(a)(3)), his Total Offense Level would have been 12,[4] which at Criminal History II corresponds to a Guidelines Range of 12-18 months.

Mr. Bradley is not seeking a sentence of between 12-21 months' imprisonment. However, he respectfully requests that the Court consider the nature and circumstances of his offense – and the nature of the evidence against him at trial – in assessing whether the recommended Guidelines range "properly reflect(s) § 3553(a) considerations."

### c. A Variance is Necessary Here to Avoid Unwarranted Sentencing Disparity.

A variance may be required "to avoid unwarranted disparity among defendants with similar records who have been found guilty of similar conduct." *U.S.C.C. Primer* at 41. That is the case here. Analysis of sentences imposed on other January 6 defendants convicted under §111(b) – for conduct far more serious than Mr. Bradley's – reveals that a sentence of 87-108 months in this case would be vastly disproportionate.

Thomas Smith "escalated the violence against the Capitol and the officers defending it, using a "battle flag" as a weapon. Government's Sentencing Memorandum, *United States*

---

[4] This calculation is based on U.S.S.G. §2A2.4, which calls for a base offense level of 10, and U.S.S.G. §3C1.1, which provides for a 2-level enhancement for obstruction of justice.

11

*v. Smith*, No. 21-cr-599-RBW (Oct. 10, 2023) [ECF No. 156] at 2. According to the government:

> Smith confronted a line of officers attempting to clear the Upper West Terrace ("Terrace") and pushed back against them. He kicked Officer Anthony Rowley in the back, sending him to the ground. And he threw a metal pole at Officer Anthony Campanale, hitting him in the head. When another pole hit the line of officers, Smith said "You deserve that, you piece of shit."

*Id.* The government also asserts that Smith "stole a baton from a Capitol Police Officer," and that "[i]n messages sent on January 6 and shortly after, Smith bragged about 'storming the Capitol' and made light of the violence against the officers," and that he testified falsely at trial. *Id.* at 2, 24.

At sentencing, Smith was assigned Criminal History category II, the same as Mr. Bradley. *Id.* at 20. Also like Micheal Bradley, Smith went to trial, was found to have testified falsely, and received an offense level adjustment under U.S.S.G. §3C1.1. They were thus similarly situated, except that Smith's total adjusted offense level was 33 (versus Mr. Bradley's 28). The government recommended a sentence of 168 months, the "midpoint" of the applicable advisory Guidelines' range of 151-188 months. *Id.* at 3.

This Court rejected that recommendation, however, and imposed a sentence of 108 months' imprisonment. Judgment, *United States v. Smith*, No. 21-cr-599-RBW (Nov. 3, 2023) [ECF No. 176] at 3. Thus, the Court effectively discounted Smith's total adjusted offense level by 3 levels, to 30. A variance similar to that granted to Smith is certainly appropriate for Mr. Bradley, whose conduct on January 6 pales in comparison to Smith's (there is no evidence that Mr. Bradley made physical contact with, or injured, any officer, that he robbed any officer, or that he celebrated his acts after January 6), and whose family and health circumstances are unique. Applying the same three-level variance to Mr. Bradley results in a total adjusted offense level of 25, and a recommended Guidelines range of 63-78 months' imprisonment.

12

In *United States v. Billyard,* No. 22-cr-34-RBW, this Court imposed a sentence of 40 months' imprisonment on a defendant convicted, as Mr. Bradley was, of violating 18 U.S.C. §111(a)(1) and (b). The government characterized the defendant in that case, Aiden Billyard, as "a *critical member* of the mob that used violence to interrupt the certification of the 2020 Electoral College vote count, threaten the peaceful transfer of power after the 2020 Presidential election, and injure more than one hundred police officers." Government's Sentencing Memorandum, *United States v. Billyard,* No. 22-cr-34-RBW (Mar. 14, 2023) [ECF NO. 50] at 1 (emphasis added). Mr. Billyard discharged pepper gel at a line of MPD officers guarding the Capitol. *Id.* at 2, 6. According to the government, pepper *gel* is "more potent" than pepper *spray*, "the very point" of which is "cause intense pain." *Id.* at 6; *see also id.* at 6-7 (MPD officer testified that chemical spray was "far stronger than any chemical munition he had previously been exposed to," and "caused him extreme pain and incapacitated him … prevent[ing] him from carrying out his law enforcement duties").

After spraying the officers with pepper gel, Billyard stood next to an individual (Gardner) who "struck [a glass window] with a metal tomahawk." Billyard encouraged Gardner by shouting, "'Window! Window! Break it!' and clapping." Billyard then nodded to a third person, who handed Billyard a baseball bat, which Billyard attempted to hand to Gardner. When Gardner refused to take the bat:

> Bilyard used the bat to strike the lower portion of the glass window in an attempt to breach the U.S. Capitol Building. … Moments later, Bilyard successfully shattered the lower glass portion of the window. … Bilyard then turned to face the crowd and appeared to clap and shout in an apparent act of encouragement for people to start entering the U.S. Capitol Building through the window. He and Gardner appear to yell, "it's open!" Soon after, many people, led by Bilyard, entered the U.S. Capitol Building by crawling through the window that he had shattered.

13

*Id.* at 10-13.  The persons who climbed through that window entered a conference room, taking from it "items … that could be used as weapons, such as table legs and lamps," and "passed the objects to people outside the broken window in order to aid the rioters who were assaulting law enforcement officers in the Tunnel." *Id.* at 15.  The government noted that "Bilyard showed no remorse for his crimes in the immediate aftermath of the riot," joking on social media about the pepper gel he sprayed on Capitol Police officers on January 6, behaving "defiant[ly]" when interviewed by FBI agents, and lying to those agents. *Id.* at 16-17.

Billyard pled guilty to violating 18 U.S.C. §111(a)(1) & (b).  Stating that "[t]he nature and circumstances of Bilyard's offense were of the utmost seriousness," the government recommended a sentence of 47 months' incarceration, which the government stated, "reflects the gravity of Bilyard's conduct." *Id.* at 2, 19.  The Court imposed a sentence of 40 months' imprisonment.  Judgment, *United States v. Billyard,* No. 22-cr-34-RBW (Mar. 23, 2023) [ECF NO. 54] at 2.

The gravity of the conduct for which Micheal Bradley has been convicted is similar to that of Mr. Bilyard.  Both were convicted of assaulting law enforcement officers with dangerous weapons (Billyard with pepper gel, and Micheal Bradley with a baton).  But unlike Mr. Bilyard, there is no evidence that Mr. Bradley inflicted any injury on any law enforcement officer, or that Mr. Bradley damaged any property, enabled others to obtain weapons, or encouraged anyone to enter the Capitol.[5]

The Guidelines range applicable here – 87-108 months –calls for a sentence more than twice that imposed on Aiden Bilyard.  That discrepancy is fueled, in part, by the fact that

---

[5] There is evidence that Mr. Bradley waved to other individuals in the crowd at the Capitol on January 6, 2021, but no evidence as to the target or purpose of this wave.

14

Mr. Bilyard pled guilty and had a lower criminal history score, and by the fact that Mr. Bradley's offense level includes a 2-level enhancement for obstruction, based on his trial testimony. But even controlling for these factors, imposing a sentence between 78 and 97 months on Micheal Bradley would create an unwarranted disparity.

The sentence imposed on Mr. Bilyard – at his criminal history category of I – reflects a total offense level of 21. Adding two levels to this for obstruction under U.S.S.G. 3C1.1 results in an Offense Level of 23. Adding another 3 levels to account for Mr. Bilyard's acceptance of responsibility, results in an offense level of 26. At Mr. Bradley's criminal history category of II, this results in a range of 70-87 months.

Even a sentence at the low end of that range would be higher than that imposed on other January 6 defendants convicted of violating §111(b) on the basis of facts more egregious than those at issue here. For example, in the months prior to January 6, Geoffrey Sills made "multiple purchases at stores … which sell body armor, weapons, gas masks, and other combat equipment, and on January 6, Sills "arrived in the nation's Capital armed with such a gas mask, and wearing … tactical gloves, ear protection, and black goggles." Government's Sentencing Memorandum, *United States v. Geoffrey Sills,* No. 21-cr-40-TNM (Mar. 14, 2023) [ECF NO. 574] at 14. When he arrived at the Capitol, he threw "several pole-like objects" at law enforcement officers. *Id.* at 15. Then, he "forcefully wrested away a police department-issued baton" from an MPD Officer defending the entrance to the Capitol, whom he then struck with the baton, after which he "lifted the baton above his head in what appears to be an effort to signal and galvanize the crowd." *Id.* at 16-17, 20. Sills then used the baton "to repeatedly strike at officers," including an officer Sills struck on the arm, and who

sustained multiple bruises from strikes on various parts of his body from the assaults he suffered on January 6.[6]  *Id.* at 18.

Sills was convicted on multiple counts, including not only assaulting law enforcement officers (18 U.S.C. §111), but also Robbery (18 U.S.C. 2111) and Obstruction of an Official Proceeding (18 U.S.C. §1512(c)(2)).  His Combined Adjusted Offense Level was 33. Government's Sentencing Memorandum, *United States v. Geoffrey Sills,* No. 21-cr-40-TNM (Mar. 14, 2023) [ECF No. 574] at 36.  Following a stipulated trial, this was reduced by three levels for acceptance of responsibility under U.S.S.G. §3E1.1.  *Id.*  At a Combined Adjusted Offense Level of 30, and in Sills' criminal history category (I), the Guidelines recommended a sentence of 97-121 months' imprisonment.  *Id.*  However, the court sentenced Sills to only 52 months' imprisonment, which is 40-80% lower than the sentence called for at the recommended Guidelines range here.

Finally, it is worth comparing the recommended Guidelines range in this case with the sentences meted out to January 6 defendants convicted of what was perhaps the most egregious act of violence on law enforcement officers – the assault of Capitol Police Officer Michael Fanone.  Officer Fanone was part of a police line guarding the Lower West Terrace Tunnel on January 6, when Albuquerque Head began to strike him and other officers with a stolen police riot shield.  When Officer Fanone used his hand to brace himself on a doorframe, Head struck his hand, causing Officer Fanone to lose his grip.  As the officers tried to push Head out of the tunnel, he "wrapped his arm around Officer Fanone's neck and emitted a sickening yell to his fellow rioters—'I've got one!'"  Head then "forcibly dragged Officer Fanone

---

[6] The *Sills* court held that "because of the tumult of the day," the government failed to prove that any of the bruises the officer suffered were caused by Sills.  Transcript, *United States v. Geoffrey Sills,* No. 21-cr-40-TNM (Mar. 24, 2023) [ECF No. 590] at 14-15.

into the riotous mob, isolating him as the crowd violently assaulted the officer." Government's Sentencing Memorandum, *United States v. Head,* NO. 21-cr-291-2-ABJ (Oct. 119, 2022) [ECF No. 159] at 3.

At that point, Daniel Rodriguez tased the officer with a taser he apparently obtained from Kyle Young. Government's Sentencing Memorandum, *United States v. Young,* No. 21-cr-291-3-ABJ (Sept. 13, 2022) [ECF No. 140] at 16-17. After providing Rodriguez with the taser, Young – and his minor son, whom Young brought to the Capitol on that day– flashed a strobe light at officers, threw a large speaker at them, and "jabbed" them with a long pole. *Id.* at 20-21, 25-26. Then as the crowd began to assault Officer Fanone, and Rodriguez moved to tase him, Young "pointed in the direction of the assault on Officer Fanone and quickly and forcefully moved through the crowd to join the attack." *Id.* at 28. Young "fought his way through the crowd and lunged in Officer Fanone's direction repeatedly while Head pulled Fanone deeper into the crowd." *Id.* at 29. As Rodriguez tased Officer Fanone a second time, Young "lunged toward Officer Fanone," and "grabbed Officer Fanone's wrist and restrained him by pulling his arm away from his body when the officer [was] at his most vulnerable, reeling from the assault with the taser." *Id.* at 30-31.

Throughout the assault, members of the crowd yelled, "Kill him!" and "Get his gun!" Officer Fanone felt the rioters grabbing and pulling on his body and uniform the entire time he was in the crowd. *Id.* at 27. Officer Fanone stated that the attack "scared the shit out of me," and caused him to suffer a heart attack. *Id.;* Zachary Cohen & Marshall Cohen, *The January 6 select committee will hear from 4 police officers Tuesday. Here are their stories.,* CNN (July 26, 2021), available at https://www.cnn.com/2021/07/26/politics/witness-list-january-6-committee-hearing/index.html.

17

For their roles in Officer Fanone's assault, Head was sentenced to 90 months' imprisonment – at the *low end* of the recommended Guidelines Range for Mr. Bradley. Judgment, *United States v. Head,* No. 21-cr-291-2-ABJ (Nov. 1, 2022) [ECF No. 171] at 2. Young received 86 months, which is *below* the recommended range in this case. Judgment, *United States v. Young,* No. 21-cr-291-3-ABJ (Sept. 29, 2022) [ECF No. 149] at 2. Mr. Bradley's conduct on January 6 comes nowhere near the same level of seriousness as that of Messrs. Head and Young. Sentencing him to a term equal to, or even greater than, the sentences meted out to these offenders would be extremely disproportionate.

In sum, more than 1100 individuals have been convicted of crimes arising from the events of January 6, 2021. *See* Ryan J. Reilly, *Days before the election, DOJ continues to prosecute new Jan. 6 cases,* NBC News (Nov. 3, 2024), available at https://www.nbcnews.com/politics/justice-department/new-jan-6-arrests-sentences-ahead-2024-election-rcna178505. Of these, only about two dozen – approximately 2% – have received sentences exceeding 87 months. This group includes individuals convicted of far more serious crimes than Mr. Bradley, such as seditious conspiracy, *United States v. Rhodes, et al.,* No. 22-cr-15-APM; *United States v. Nordean, et al.* No. 21-cr-175-TJK, and those convicted under 18 U.S.C. §111(b) for tasing Officer Fanone, *United States v. Rodriguez,* No. 21-cr-246-ABJ, tackling a police officer – while armed with a gun – and attempting to choke him while others kicked him, Government's Sentencing Memorandum, *United States v. Webster,* No. 21-cr-208-APM (Aug. 24, 2022) [ECF No. 104] at 21-24; and "hurl[ing] a wooden staff like a spear" at officers, striking one in the head, "swip[ing] repeatedly at [another officer]'s face, trying to strike him and dislodge his gas mask," and "wrench[ing a third officer's] shoulder so hard and for so long that he permanently damaged it, ending [the officer's] law enforcement career." *See* Government's Sentencing Memorandum, *United*

*States v. Fitzsimmons,* No. 21-cr-158-RC (May 26, 2023) [ECF No. 116] at 2. Micheal Bradley's actions on January 6 do not, by any stretch of the imagination, merit the same punishment as that meted out to these most serious offenders. He should not be sentenced as if they do.

## CONCLUSION

For all the foregoing reasons, a sentence of 60 months' imprisonment would be "sufficient, but not greater than necessary" to reflect the seriousness of Mr. Bradley's offense, promote respect for the law, and provide just punishment for the offense, while also avoiding unwarranted sentence disparities. Mr. Bradley respectfully requests that the Court impose such a sentence.

Dated: December 12, 2024                    Respectfully submitted,

                                                /s/ Paul F. Enzinna
                                               D.C. Bar No. 421819
                                               Ellerman Enzinna Levy PLLC
                                               1050 30th Street, NW
                                               Washington, DC 20007
                                               202.753.5553
                                               penzinna@eellaw.com

                                               *Counsel for Defendant Micheal Bradley*

## CERTIFICATE OF SERVICE

I certify that on December 12, 2024, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Dated: December 12, 2024                                      Respectfully submitted,

   /s/ Paul F. Enzinna
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com

*Counsel for Defendant Micheal Bradley*